FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Oct 27, 2023

SEAN F. McAVOY, CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| KEDGE B.,<br><br>              Plaintiff,<br><br>  v.<br><br>KILOLO KIJAKAZI, Acting<br>Commissioner of Social Security,<br><br>             Defendant. | NO. 2:23-CV-0120-TOR<br><br>ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT |

BEFORE THE COURT is Plaintiff's Motion for Summary Judgment, ECF No. 9, and the Commissioner's Responsive Motion for Summary Judgment, ECF No. 13. This matter was submitted for consideration without oral argument. The Court has reviewed the administrative record and the parties' completed briefing and is fully informed. For the reasons discussed below, Plaintiff's motion for summary judgment (ECF No. 9) is **DENIED** and the order of the Social Security Commissioner is **AFFIRMED**.

//

ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ~ 1

**JURISDICTION**

The Court has jurisdiction over this case pursuant to 42 U.S.C. § 405(g).

**STANDARD OF REVIEW**

A district court's review of a final decision of the Commissioner of Social Security is governed by 42 U.S.C. § 405(g). The scope of review under § 405(g) is limited: the Commissioner's decision will be disturbed "only if it is not supported by substantial evidence or is based on legal error." *Hill v. Astrue*, 698 F.3d 1153, 1158 (9th Cir. 2012) (citing 42 U.S.C. § 405(g)). "Substantial evidence" means relevant evidence that "a reasonable mind might accept as adequate to support a conclusion." *Id.* at 1159 (quotation and citation omitted). Stated differently, substantial evidence equates to "more than a mere scintilla[,] but less than a preponderance." *Id.* In determining whether this standard has been satisfied, a reviewing court must consider the entire record as a whole rather than searching for supporting evidence in isolation. *Id.*

In reviewing a denial of benefits, a district court may not substitute its judgment for that of the Commissioner. If the evidence in the record "is susceptible to more than one rational interpretation, [the court] must uphold the ALJ's findings if they are supported by inferences reasonably drawn from the record." *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012) (citation omitted). Further, a district court "may not reverse an ALJ's decision on account of an error

that is harmless." *Id*. An error is harmless "where it is inconsequential to the [ALJ's] ultimate nondisability determination." *Id.* at 1115 (quotation and citation omitted). The party appealing the ALJ's decision generally bears the burden of establishing that it was harmed. *Shinseki v. Sanders*, 556 U.S. 396, 409–10 (2009).

## FIVE-STEP SEQUENTIAL EVALUATION PROCESS

A claimant must satisfy two conditions to be considered "disabled" within the meaning of the Social Security Act. First, the claimant must be "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). Second, the claimant's impairment must be "of such severity that he is not only unable to do his previous work[,] but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

The Commissioner has established a five-step sequential analysis to determine whether a claimant satisfies the above criteria. *See* 20 C.F.R. § 404.1520(a)(4)(i)–(v). At step one, the Commissioner considers the claimant's work activity. 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is engaged in "substantial gainful activity," the Commissioner must find that the claimant is not

disabled.  20 C.F.R. § 404.1520(b).

If the claimant is not engaged in substantial gainful activities, the analysis proceeds to step two.  At this step, the Commissioner considers the severity of the claimant's impairment.  20 C.F.R. § 404.1520(a)(4)(ii).  If the claimant suffers from "any impairment or combination of impairments which significantly limits [his or her] physical or mental ability to do basic work activities," the analysis proceeds to step three.  20 C.F.R. § 404.1520(c).  If the claimant's impairment does not satisfy this severity threshold, however, the Commissioner must find that the claimant is not disabled.  *Id.*

At step three, the Commissioner compares the claimant's impairment to several impairments recognized by the Commissioner to be so severe as to preclude a person from engaging in substantial gainful activity.  20 C.F.R. § 404.1520(a)(4)(iii).  If the impairment is as severe, or more severe than one of the enumerated impairments, the Commissioner must find the claimant disabled and award benefits.  20 C.F.R. § 404.1520(d).

If the severity of the claimant's impairment does meet or exceed the severity of the enumerated impairments, the Commissioner must pause to assess the claimant's "residual functional capacity."  Residual functional capacity ("RFC"), defined generally as the claimant's ability to perform physical and mental work activities on a sustained basis despite his or her limitations (20 C.F.R. §

404.1545(a)(1)), is relevant to both the fourth and fifth steps of the analysis.

At step four, the Commissioner considers whether, in view of the claimant's RFC, the claimant is capable of performing work that he or she has performed in the past ("past relevant work"). 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant is capable of performing past relevant work, the Commissioner must find that the claimant is not disabled. 20 C.F.R. § 404.1520(f). If the claimant is incapable of performing such work, the analysis proceeds to step five.

At step five, the Commissioner considers whether, in view of the claimant's RFC, the claimant is capable of performing other work in the national economy. 20 C.F.R. § 404.1520(a)(4)(v). In making this determination, the Commissioner must also consider vocational factors such as the claimant's age, education and work experience. *Id.* If the claimant is capable of adjusting to other work, the Commissioner must find that the claimant is not disabled. 20 C.F.R. § 404.1520(g)(1). If the claimant is not capable of adjusting to other work, the analysis concludes with a finding that the claimant is disabled and is therefore entitled to benefits. *Id.*

The claimant bears the burden of proof at steps one through four above. *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1228 (9th Cir. 2009). If the analysis proceeds to step five, the burden shifts to the Commissioner to establish that (1) the claimant is capable of performing other work; and (2) such work

"exists in significant numbers in the national economy."  20 C.F.R. § 416.1560(c);

*Beltran v. Astrue*, 700 F.3d 386, 389 (9th Cir. 2012).

### ALJ'S FINDINGS

On January 27, 2020, Plaintiff applied for Title II disability insurance benefits, alleging a disability onset of June 1, 2018.  Tr. 23.  The claim was denied initially on November 5, 2020, and upon reconsideration on July 26, 2021.  *Id.* Plaintiff requested a hearing.  *Id.*  On March 16, 2022, a telephonic hearing was held before an administrative law judge ("ALJ").  *Id.* at 44.

On March 30, 2022, the ALJ denied Plaintiff's claim.  *Id.* at 23-34.  As a threshold matter, the ALJ found Plaintiff met the insured status requirements of the Social Security Act through June 30, 2023.  *Id.* at 25.  At step one of the sequential evaluation analysis, the ALJ found Plaintiff had not engaged in substantial gainful activity from June 1, 2018—the alleged onset date—through June 30, 2023.  *Id.* At step two, the ALJ identified the following severe impairments: morbid obesity; diabetes with peripheral neuropathy; minimal osteoarthritis of the left knee; mild osteoarthritis of the bilateral hips; and hidradenitis suppurativa.  *Id.*  At step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment.  *Id.* at 27.  The ALJ then found that Plaintiff had the RFC "to perform a full range of sedentary work" with the following limitations:

> [H]e cannot climb ladders, ropes, or scaffolds; he can frequently perform all other postural activities; and he cannot have concentrated exposure to extreme cold, extreme heat, or vibration.

*Id.* at 28.

At step four, the ALJ found Plaintiff was unable to perform any past relevant work as a home attendant or cook. *Id.* at 32. At step five, the ALJ decided that, considering Plaintiff's age, education, work experience, RFC, and testimony from a vocational expert, there were other jobs that existed in significant numbers in the national economy that Plaintiff could perform through the date last insured, such as appointment clerk, assembler, and telephone solicitor. *Id.* at 32-33. Based on the foregoing analysis, the ALJ concluded that Plaintiff was not under a disability as defined in the Social Security Act from June 1, 2018, through the date of the decision. *Id.* at 34.

On February 27, 2023, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. *Id.* at 7-11; *see also* 20 C.F.R. §§ 404.981, 422.210.

## ISSUES

Plaintiff seeks judicial review of the Commissioner's final decision denying him disability insurance benefits under Title II of the Social Security Act. Plaintiff submits the following issues for review:

1. Whether the ALJ improperly evaluated the medical opinion evidence;

2.  Whether the ALJ erred by finding that Plaintiff's medical conditions did not meet or medically equal the severity of a listed impairment at step three;

3.  Whether the ALJ improperly assessed Plaintiff's subjective symptom reports; and

4.  Whether the ALJ failed to meet his burden at step five.

## DISCUSSION

**A.    Evaluation of Medical Opinion Testimony**

Plaintiff challenges the ALJ's evaluation of his treating physician, Mark Parsons, M.D.  ECF No. 9 at 9.  The Court finds that the ALJ appropriately considered the medical opinion testimony of Dr. Parsons.

Because Plaintiff's alleged onset date was June 1, 2018, the new regulations for how an ALJ must evaluate medical opinion evidence under Title II are controlling.  *See* 20 C.F.R. § 404.1520c; Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01 (Jan. 18, 2017), *available at* 2017 WL 168819.[1]

---

[1] Defendant suggests that the ALJ applied the old regulations—captured in 20 C.F.R. § 404.1527—in evaluating Dr. Parsons' medical opinion and that the Court should here, too, because Plaintiff previously applied for disability benefits

1    Under the new regulations, the ALJ "must 'articulate . . . how persuasive' it

2    finds 'all of the medical opinions' from each doctor or other source, and 'explain

3    how it considered the supportability and consistency factors' in reaching these

4    findings." *Woods v. Kijakazi*, 32 F.4th 785, 792 (9th Cir. 2022) (citing 20 C.F.R.

5    §§ 404.1520c(b), 404.1520c(b)(2) (brackets omitted)).  The factors for evaluating

6    the persuasiveness of medical opinions and prior administrative medical findings

7    include supportability, consistency, relationship with the claimant, specialization,

8    and "other factors that tend to support or contradict a medical opinion or prior

9    administrative medical finding," including but not limited to "evidence showing a

10    medical source has familiarity with the other evidence in the claim or an

11

12    _____

13    before March 27, 2017.  ECF No. 13 at 3.  First, the ALJ considered Dr. Parsons'

14    opinion under the new regulations, not the old ones.  *See* Tr. 28 ("I have . . .

15    considered the medical opinion(s) . . . in accordance with the requirements of 20

16    CFR 404.1520c.").  Second, Plaintiff's previous denial of disability benefits is

17    irrelevant because the application in issue here was filed *after* the new regulations

18    took effect.  *See id.* at 71-75, 78, (indicating that Plaintiff previously applied for

19    benefits on October 7, 2011, and was denied on March 14, 2013, after failing to

20    appear for a hearing, which he did not appeal from).

1  understanding of our disability program's policies and evidentiary requirements."

2  20 C.F.R. § 404.1520c(c)(1)–(5).

3       As abovementioned, the ALJ is required to explain how the two most

4  important factors, supportability and consistency, were considered. 20 C.F.R. §

5  404.1520c(b)(2).  Those factors are defined as follows:

6       (1) Supportability. The more relevant the objective medical evidence
        and supporting explanations presented by a medical source are to
7       support his or her medical opinion(s) or prior administrative medical
        finding(s), the more persuasive the medical opinions or prior
8       administrative medical finding(s) will be.

9       (2) Consistency. The more consistent a medical opinion(s) or prior
        administrative medical finding(s) is with the evidence from other
10      medical sources and nonmedical sources in the claim, the more
        persuasive the medical opinion(s) or prior administrative medical
11      finding(s) will be.

12  20 C.F.R. § 404.1520c(c)(1)-(2).

13       The ALJ characterized Dr. Parsons' testimony as only "partially persuasive."

14  Tr. 31.  Dr. Parsons filled out a two-and-a-half page questionnaire-style form

15  assessing Plaintiff's application for disability benefits.  *Id.* at 918-20.  Dr. Parsons

16  began treating Plaintiff at the end of November 2019.  *Id.* at 918.  Dr. Parsons

17  diagnosed Plaintiff with peripheral neuropathy, insulin-dependent diabetes,

18  polyarthropathy, hypertension, obesity, and sleep apnea.  *Id.*  He indicated that, if

19  required to work a regular 40-hour week, Plaintiff would likely miss four or more

20  days per month due to his inability to be on his feet for extended periods of time,

1    and off-task and unproductive over 30% of the time.  *Id.* at 918-20.  Dr. Parsons

2    also checked boxes stating that Plaintiff could use his upper right and left

3    extremities to reach and handle objects on an "[o]ccasional" basis, but could use

4    his fingers on a more "[c]onstant" basis.  *Id.* at 919.  Based on these limitations,

5    Dr. Parsons indicated that Plaintiff was capable of "sedentary work," which the

6    form defined as the ability to:

7        [L]ift 10 lbs. maximum and frequently lift and/or carry articles such as
         dockets, ledgers, and small tools.  Although a sedentary job involves
8        sitting, a certain amount of walking and standing may be necessary.

9    *Id.* at 919.

10       The ALJ agreed that the limitation to sedentary work was appropriate, but

11   disagreed that Plaintiff would likely miss four or more days of work per month,

12   explaining that the limitation to sedentary work accommodated Plaintiff's inability

13   to stand on his feet for multiple hours per day.  *Id.*  The ALJ also disagreed with

14   Dr. Parsons' determination that Plaintiff had limited ability in his upper extremities

15   to reach for objects, stating that it was unsupported by the longitudinal record and

16   contradicted by state consultant Adult Gerontology Nurse Practitioner (AGNP)

17   Lisa Henderson's physical examination, which showed a full range of motion in

18   the bilateral shoulders.  *Id.*

19       Plaintiff argues that the ALJ's determination that the swelling and pain in his

20   lower extremities would be accommodated by a limitation to sedentary work is

1    unsupported because "such work still requires standing two hours per day and

2    spending the remaining time sitting in a regular chair with feet on the ground."

3    ECF No. 9 at 11.  He claims that he cannot meet these requirements of regular

4    employment due to his need to take frequent breaks with his legs in an elevated

5    position above his heart.  *Id.* at 12.

6         Plaintiff's claim that the ALJ did not properly credit Dr. Parsons' report

7    respecting a sedentary work limitation is confusing given that Dr. Parsons himself

8    indicated that Plaintiff could perform sedentary work.  *See* Tr. 919.  In any case,

9    the ALJ disregarded these claims as inconsistent with longitudinal record, writing,

10   "The medical evidence of record also appears to show no reports to providers that

11   [Plaintiff] has to elevate his feet for substantial portions of the day, as testified to at

12   the hearing," *id.* at 29, and adding that the record instead "show[ed] high-

13   functioning activities of daily living and objective findings of normal gait and only

14   mild peripheral neuropathy," *id.* at 31.  In addition to lacking an independent basis

15   in the medical record, the ALJ explained that Plaintiff's claims were unsupported

16   because Dr. Parsons did not adequately explain how he identified this limitation,

17   noting, "Dr. Parson[s'] medical opinion was set forth in [a] checkbox . . . with little

18   explanation for the limitations give[n], and what little explanation was given does

19   not make sense." *Id.* at 31.  Plaintiff retorts that the paperwork completed by Dr.

20   Parsons was not merely a checkbox form, but supported by other findings.  ECF

No. 9 at 11 (arguing that "check box forms . . . supported by other findings[ ] shall be 'entitled to weight that an otherwise unsupported and unexplained check-form would not merit'") (quoting *Garrison v. Colvin*, 759 F.3d 995, 1013 (9th Cir. 2014)). However, Plaintiff does not identify a finding from Dr. Parsons or another medical provider in the record which backs his need to take frequent elevation breaks. Tr. 919. Indeed, Dr. Parsons' contemporaneous finding that Plaintiff *could* hold a sedentary job tends to support the assertion that, whatever limitations afflict Plaintiff, a sedentary work environment could accommodate those needs or otherwise mitigate the number of necessary absences.

Plaintiff also faults the ALJ for rejecting Dr. Parsons' claim that Plaintiff's ability to reach and handle objects was hindered due to his hidradenitis suppurativa, which causes open sores under his armpits, and bilateral upper extremity neuropathy, which causes pain and swelling. ECF No. 9 at 10. He further presses that the ALJ's acceptance of conflicting testimony from state consultant AGNP Henderson was inappropriate on this point because AGNP Henderson "was not an acceptable medical source" and her evaluation was only "cursory" and not "hands-on." *Id.*

Plaintiff argues that Dr. Parsons' findings were consistent with other findings in the record which reported that he was experiencing sores, skin tags, and nerve pain in his upper arms. *See* TR. 686, 690, 929. However, the existence of

some competing evidence does not compel the Court to accept Plaintiff's version of events. Instead, the issue is whether the ALJ entered appropriate findings as to the supportability and consistency of Dr. Parsons' opinion. Although Plaintiff's reports of arm and underarm pain were consistent with some isolated parts of the medical record, the ALJ found that they were inconsistent with "the *longitudinal* record." *Id.* at 30. For example, the ALJ noted that EMG testing in January 2022 showed that Plaintiff's upper extremity strength was normal. *Id.* at 29, 876. By contrast, the report Plaintiff cites are from September 2020 and March 2021. *See, e.g*, *id.* at 929, 938. It was not an issue for the ALJ to find the recent 2022 report more probative than older ones. *Osenbrock v. Apfel*, 240 F.3d 1157, 1165 (9th Cir. 2001); *see also* Tr. 622 (AGNP Henderson finding in October 2020 that Plaintiff had "no lesions, open ulcerations or rashes). The ALJ also found Dr. Parsons' diagnosis was inconsistent with Plaintiff's engagement in other high-functioning daily activities, including "lifting a large Amazon package, teaching a cooking class, and volunteering at a food bank." Tr. at 30. These activities are inconsistent with Dr. Parsons' report that Plaintiff's disabilities prevented him from reaching or handling objects more than "occasionally," *id.* at 919, and the ALJ was entitled to take them into consideration when evaluating Dr. Parsons' report.

For similar reasons as those given above, the ALJ also appropriately determined that Dr. Parson's opinions regarding Plaintiff's upper extremity

strength lacked supportability.  Specifically, the ALJ noted that the opinion was in checklist form and accompanied by little explanation for the limitations provided. *Id.* at 31.  Respecting Plaintiff's upper extremity conditions, Dr. Parsons simply ticked off boxes without explanation.  The ALJ was not required to credit a finding unaccompanied by any supporting explanations.  20 C.F.R. § 404.1520c(c)(1).

As to AGNP Henderson's consultive opinion, the ALJ did not totally defer to her evaluation.  *See* Tr. 30 (writing that her findings were only "somewhat persuasive").  The ALJ disagreed that Plaintiff had no restrictions regarding the use of his lower extremities to stand, walk, sit, or climb stairs, explaining that he found his limitations to be more consistent with sedentary work.  *Id.*  However, the ALJ credited AGNP Henderson's findings that Plaintiff had a normal gait, saying it was "supported by her thorough consultative physical examination."  *Id.*  By contrast, Plaintiff argues in his briefing that AGNP Henderson's examination was cursory and hands-off.  ECF No. 9 at 10.  However, at the hearing itself, Plaintiff's memory of the examination waivered:

> She had me lift my arms up in like a—the motion that you would do if you were telling a car to stop.  Straight arm forward, all your fingers pointing towards the sky, then she told me to point my hand straight and then flex it back up.  She didn't do no hands on.  They might've done my blood pressure and I think that's a—I don't even think she did that.  I think some—I don't remember.  It's been a long time.  But it was just weird . . . I'll be honest with you, I'm having a hard time rember[ing] anything—it was so short and so little contents [sic] to the meeting that I don't remember anything standing out that seemed significant for, you know, that's what I would say to that.

. . .

> [She had] a tiny, tiny, tiny office and there would be—or, you know, exam room, and, you know, three steps I'd have been across the room, but I don't remember her . . . it may have happened, but I don't remember her telling me to walk across the room at all.

Tr. 59-60.

The report from AGNP Henderson reveals something quite different. In that document, AGNP Henderson discusses Plaintiff's completion of a variety of physical tests, including the ability to rise without assistance, perform a partial squat, stand on his toes, and walk heel-to-toe and well as heel-to-shin. *See id.* at 629. Given Plaintiff's uncertainty about what occurred, it was not unreasonable for the ALJ to find that AGNP Henderson's contemporaneous written report was the most accurate summary of their meeting. In any case, Plaintiff's testimony at the hearing does not support his characterization in the brief as a totally "hands-off" examination. The ALJ was therefore within his authority to accept AGNP Henderson's medical findings as partially supported by her observations and the longitudinal record. Accordingly, the Court finds that the ALJ's evaluation of Plaintiff's medical opinion evidence was corroborated by substantial evidence.

**B.    Step Three Analysis**

Plaintiff challenges the ALJ's step three analysis, contending that his disability should have been found to meet or equal Listing 8.06. ECF No. 9 at 14.

1   Specifically, he claims that he meets Listing 8.06 due to his hidradenitis

2   suppurative—a condition causing skin lesions under his arms—which first

3   presented in September 2020, and Plaintiff revisited a doctor about in October

4   2020.  *Id.*

5       Listing 8.06 defines hidradenitis suppurativa as "extensive skin lesions

6   involving both axillae, both inguinal areas or the perineum that persist for at least 3

7   months despite continuing treatment as prescribed."  20 C.F.R. Part 404, Subpart

8   P, App'x 1, § 8.06.  The claimant bears the burden of proving that he meets or

9   equals the criteria of an impairment listed in Appendix 1 of the regulations.  *Burch*

10  *v. Barnhart*, 400 F.3d 676, 683 (9th Cir. 2005).  The ALJ determined that Plaintiff

11  did not meet these required conditions.  Tr. 27.

12      The Court agrees that, even if Plaintiff's preferred medical reports are

13  evaluated in isolation, they do not meet the required elements of Listing 8.06.

14  Plaintiff's first doctor's visit regarding his skin lesions was September 30, 2020.

15  Tr. 685.  He reported "an ulcer in his left armpit, [ ] bilateral axillary fungal rash,

16  as well as multiple skin tags," adding that "the ulcer has been there for about 4

17  months and is not getting better."  *Id.* at 686.  He also reported that he was

18  suffering from skin tags "located in his bilateral underarms, on his torso, his back,

19  and in his intertriginous region."  *Id.*

20

On October 19, 2020, Plaintiff was again seen for similar complaints.  The doctor agreed that he presented with "a small tunneling/tract in the left lateral axillary region" and had a bilateral underarm rash.  *Id.* at 690.  He was prescribed medication for the rash and the ulcer and referred to a dermatologist for the skin tags.  *Id.* at 687, 690.

As these reports verify, Plaintiff did not suffer from a bilateral lesion in both axillae (underarms), both inguinal areas, or the perineum.  Instead, the sore was on his left underarm.  *Id.* at 686.  Although he had a rash on both underarms and skin tags elsewhere on the body, the Listing specifically requires skin lesions on both sides, and Plaintiff did not complain of an ulcer on his right underarm.  Further, the Listing requires persistence of the symptoms for at least 3 months despite continuing prescribed treatment.  Although Plaintiff told his doctors he had been suffering for several months before coming in and that this was an issue he had been attempting to manage on his own, his self-directed course of treatment does not meet the requirements of the listing which requires compliance with "prescribed" treatment.  Since Plaintiff did not submit information to the ALJ indicating he continued with his doctor's prescribed treatments after his assessments in September or October, the ALJ's determination that Plaintiff's symptoms did not meet Listing 8.06 is supported by substantial evidence.

## C.    Assessment of Subjective Complaints

Plaintiff claims the ALJ failed to identify clear and convincing reasons for rejecting his subjective symptom testimony.  ECF No. 9 at 16.  Specifically, Plaintiff argues that the ALJ (1) ignored his neuropathy pain complaints, (2) falsely accused him of non-compliance with his treatment regimen, (3) ignored the fact that sedentary work would not account for Plaintiff's need to elevate his legs, (4) overvalued Plaintiff's modest daily activities, and (5) failed to consider the side effects of Plaintiff's prescribed medications, which cause drowsiness.  *Id.* at 16-20.

The Commissioner undertakes a two-step test to determine whether a claimant's subjective symptom testimony can be reasonably accepted as consistent with the objective record evidence.  Social Security Ruling ("SSR") 16-3p, 16-3p, 2016 WL 1119029, at *2.  "First, the ALJ must determine whether there is 'objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged.'"  *Molina*, 674 F.3d at 1112 (quoting *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009)).  "The claimant is not required to show that her impairment 'could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom.'"  *Vasquez*, 572 F.3d at 591 (quoting *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007)).

1    Under the second step, the ALJ will evaluate the intensity, persistence, and

2    limiting effects of the claimant's symptoms to determine the degree to which they

3    limit the claimant's ability to work. *Brown-Hunter v. Colvin*, 806 F.3d 487, 491

4    (9th Cir. 2015). "[T]he ALJ can only reject the claimant's testimony about the

5    severity of the symptoms if she gives 'specific, clear and convincing reasons' for

6    the rejection." *Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th Cir. 2014) (citations

7    omitted). General findings are insufficient; instead, the ALJ must identify what

8    symptoms are being discounted and what evidence undermines those claims. *Id.*

9    (quoting *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995)); *Thomas v. Barnhart*,

10   278 F.3d 947, 958 (9th Cir. 2002). "The clear and convincing [evidence] standard

11   is the most demanding required in Social Security cases." *Garrison*, 759 F.3d at

12   1015 (quoting *Moore v. Comm'r of Soc. Sec. Admin.*, 278 F.3d 920, 924 (9th Cir.

13   2002)).

14   The ALJ must consider all of the record evidence "to determine how

15   symptoms limit ability to perform work-related activities." SSR 16-3p, 2016 WL

16   1119029, at *2. When evaluating the intensity, persistence, and limiting effects of

17   a claimant's symptoms, the ALJ should consider the following: (1) daily activities;

18   (2) the location, duration, frequency, and intensity of pain or other symptoms; (3)

19   factors that precipitate and aggravate the symptoms; (4) the type, dosage,

20   effectiveness, and side effects of any medication an individual takes or has taken to

alleviate pain or other symptoms; (5) treatment, other than medication, an individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment an individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms. *Id.* at *7-8; 20 C.F.R. § 404.1529(c)(3).

At step one, the ALJ found that "claimant's medically determinable symptoms could reasonably be expected to cause some of the alleged symptoms." Tr. 20. At step two, however, the ALJ wrote, "the claimant's statements concerning the intensity, persistence, and limiting effects . . . are not entirely consistent with the medical evidence and other evidence in the record." *Id.*

Plaintiff argues that, in making this determination, the ALJ improperly disregarded his complaints of pain and swelling caused by peripheral neuropathy and instead focused on the fact that Plaintiff had "full strength." ECF No. 9 at 16. Although the ALJ did comment on Plaintiff's physical strength, it is not apparent that the ALJ was focused on Plaintiff's strength inasmuch as he was focused on his course of treatment for his pain management. Specifically, the ALJ observed:

> [B]ased on physical examinations and the claimant's medication dosage, it appears that any peripheral neuropathy is early and mild. Along these lines, although on diabetic foot examination conducted in August 2020 he was noted to have decreased sensation of the bilateral lower extremities, other diabetic foot examinations conducted before and after that time . . . were normal. This also included the October

2020 consultative physical examination, when the claimant had no sensory deficits to light touch using a filament and intact discrimination. The claimant's dosage of gabapentin (1,500 mg per day) is far short of the maximum allowable dosage of 3,600 mg per day, again suggesting his neuropathy is not severe. I thus find the medical evidence inconsistent with the claimant's allegation that he has advanced peripheral neuropathy; to the contrary, the evidence shows it is early, subtle, and mild.

Tr. 29.

The ALJ also noted that Plaintiff's course of treatment had been relatively conservative and that he had not seen a specialist in podiatry as recommended or worn his compression garments beyond three to four hours a day. *Id.* at 30. The ALJ further discussed Plaintiff's activities of daily living, which he found to be "high-functioning" and inconsistent with Plaintiff's self-reports. *Id.* at 30.

As this summary indicates, the ALJ was not merely focused on Plaintiff's physical strength, but on a multitude of the factors to be considered under 20 C.F.R. § 404.1529(c)(3), including his daily activities, medication, treatment, and other pain-management actions. Accordingly, the Court cannot say the ALJ's consideration of Plaintiff's strength was a single determinative factor or that the ALJ's reasoning lacked specificity. *See* ECF No. 9 at 16 (characterizing the ALJ's analysis as "vague").

Respecting the ALJ's commentary on Plaintiff's compliance with recommended treatments, Plaintiff writes,

> The ALJ appears to fault . . . [Plaintiff] for wearing compression stockings for "only" three to four hours per day.  However, the ALJ questioned the claimant at the hearing regarding his health insurance, course of treatment, and use of compression stockings, and appeared completely satisfied with his answers in neglecting to continue with any follow-up questions . . . The record has no recommendation that he wear the stockings [beyond three to four hours], and no provider has found that he was not compliant.  The ALJ . . . abused his discretion by relying on [his] own lay speculation over the opinion of a treating provider and the medical record.

ECF No. 9 at 17.

The text of the order is somewhat ambiguous as to whether the ALJ considered Plaintiff's failure to wear his compression socks beyond three to four hours a day as a matter of non-compliance or instead as evidence that Plaintiff's course of treatment had been relatively conservative thus far.  *See* Tr. 30 (noting that Plaintiff's "overall course of treatment has been routine and conservative" but also that "there is some evidence of non-compliance with treatment for peripheral neuropathy symptoms").  If the Court credits Plaintiff's characterization of non-compliance as true, then the ALJ erred because the record is devoid of any evidence that would suggest Plaintiff needed to wear the compression garments for a specific amount of time each day.  *See Garton v. Astrue*, No. 08-5635RJB, 2009 WL 2163561, at *4 (W.D. Wash. July 16, 2009) (an ALJ may not substitute their own opinion for that of a qualified medical expert).  However, even if such error existed, it was harmless because "it is clear from the record that . . . [it] was

inconsequential to the ultimate nondisability determination." *Tommasetti v. Astrue*, 533 F.1035, 1038 (9th Cir. 2008) (quotations and citations omitted). As detailed above, the ALJ relied on other specific pieces of evidence to support the finding regarding Plaintiff's objective symptom reports, including the fact that he had not followed up with specialists despite having insurance coverage to do so, and maintained a rather mild regimen of medicines to treat his symptoms.

Separately, Plaintiff renews his argument that the ALJ did not account for the fact that even a sedentary work environment would not accommodate Plaintiff's need to elevate his legs for a minimum of two hours a day to reduce swelling. As the Court discussed in Part A, this finding was actually consistent with Plaintiff's treating doctor's recommendation regarding Plaintiff's work limitations. Furthermore, the ALJ offered an in-depth explanation of why Plaintiff could tolerate a sedentary work environment despite his limitations, accounting for the facts that Plaintiff had a normal gait, engaged in high-functioning daily activities that required intermittent periods of standing and walking, and had not sought stronger prescriptions to reduce swelling, among other considerations. These rationalizations are sufficient to establish that the ALJ's determination of Plaintiff's work limitations was established by clear and convincing evidence.

Plaintiff also argues that the ALJ mischaracterized his engagement in daily activities in discussing his subjective symptom testimony. He typifies his daily

activities as only "modest" and suggests that they have no relation to his disabling conditions.  ECF No. 9 at 19.  The Court agrees with Plaintiff that, under Ninth Circuit precedent, ALJs may not suggest that basic life activities having no transferability to the work force preclude a claimant's eligibility for disability benefits. *See Garrison*, 75 F.3d at 1016; *Burch*, 400 F.3d at 681.  However, the ALJ did not exclusively rely on basic daily activities—such as shopping and light cleaning—as Plaintiff suggests.  Instead, the ALJ observed that Plaintiff had engaged in a range of high-functioning activities, such as volunteering at a food bank and catering, teaching a cooking class, and lifting heavy packages.  Tr. 30. Plaintiff responds that his engagement in more high-stakes activities have sometimes caused him injury (for instance, back pain from lifting packages) and that he needs to take frequent breaks when engaging in these activities.  ECF No. 14 at 10.  As Defendant pointed out, however, "[t]he ability to do these activities, even with some difficulty, undermined Plaintiff's statements about his limitations." ECF No. 13 at 12.  The ALJ also observed as much, writing, "the high-functioning activities of daily living . . . seem inconsistent with the degree of limitation testified to at the hearing."  Tr. 30.  Also, as abovementioned, this was not the only factor the ALJ considered in determining Plaintiff's subjective symptom reports.

Finally, Plaintiff contends that the Court failed to adequately consider the side-effects of his prescribed medications, alleging that the Gabapentin causes him

fatigue and drowsiness.  However, the ALJ took account of this complaint and observed that Plaintiff's dosage was far below the maximum dosage allowable.  Tr. 29-30.  As such, the Court finds that the ALJ's treatment of Plaintiff's subjective symptom testimony was supported by substantial evidence.

**D.    Step Five Analysis**

Plaintiff argues that the ALJ erred at Step Five of the sequential analysis by relying on an incomplete hypothetical to the vocational expert (VE) that neglected to include several of his limitations.  ECF No. 9 at 20.  He claims that when further examined regarding these limitations—such as his need to elevate his legs throughout the day and take persistent breaks—the VE testified that each limitation would independently preclude competitive employment.  *Id.*

At the hearing, the ALJ asked the VE "to consider a hypothetical individual of [Plaintiff's] age, educational background, and work history, who is capable of a full range of sedentary work with the following exceptions: the individual cannot climb ladders, ropes, or scaffolds, and can frequently perform all other postural activities, and the person cannot have concentrated exposure to extreme cold, extreme heat, or vibration."  Tr. 66.  The VE answered by saying she believed such a person could perform as an appointment clerk, assembler, or telephone solicitor. *Id.*  The Court then asked the VE whether there would be any tolerance in these jobs for time off-task, chronic absenteeism, and elevating the feet to waist level.

*Id.* at 67-68.  The VE answered that time off task could not exceed 10% of the workday and elevation could not be easily accommodated if it required lifting the legs greater than a foot off the floor.  *Id.*

Plaintiff's attorney followed up by asking the VE whether unscheduled 30-45 minute breaks for up to three times a day could be sustained in competitive employment; she answered that it could not.  *Id.* at 68.  Additionally, she responded that occasional handling, reaching, and typing limitations would limit the employment options she listed to telemarketing.  *Id.* at 69.

When the hypothetical does not reflect all the claimant's limitations, the expert's testimony has no evidentiary value to support a finding that the claimant can perform jobs in the national economy.  *DeLorme v. Sullivan*, 924 F.2d 841, 850 (9th Cir. 1991).  However, as discussed above, Plaintiff's arguments repackage limitations and symptoms—such as his need for frequent elevation breaks—that the ALJ previously rejected as unsupported by substantial evidence.  As such, the Court finds that the ALJ's step five finding does not warrant reversal.

## CONCLUSION

Having reviewed the record and the ALJ's findings, the Court concludes the ALJ's decision is supported by substantial evidence and free from harmful error.

//

//

1  **ACCORDINGLY, IT IS HEREBY ORDERED:**

2    1.  Plaintiff's Motion for Summary Judgment (ECF No. 9) is **DENIED**.

3    2.  The Commissioner's Responsive Motion for Summary Judgment (ECF

4        No. 13) is **GRANTED**.

5      The District Court Executive is directed to enter this Order and Judgment,

6  furnish copies to counsel, and **CLOSE** the file.

7      DATED October 27, 2023.

8  

9                           THOMAS O. RICE
                        United States District Judge

10

11

12

13

14

15

16

17

18

19

20